In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 22-1417
UNITED STATES OF AMERICA,
 Plaintiff-Appellee,
 v.

GARY TINSLEY,
 Defendant-Appellant.
 ____________________

 Appeal from the United States District Court for the
 Southern District of Indiana, Indianapolis Division.
 No. 19-cr-00368 — James Patrick Hanlon, Judge.
 ____________________

 ARGUED DECEMBER 7, 2022 — DECIDED MARCH 13, 2023
 ____________________

 Before FLAUM, KIRSCH, and JACKSON-AKIWUMI, Circuit
Judges.
 FLAUM, Circuit Judge. A jury convicted Gary Tinsley of
armed bank robbery, drug possession with intent to distrib-
ute, and multiple gun-related crimes. He challenges these
convictions on several bases, including the trial judge’s evi-
dentiary decisions, the suﬃciency of the evidence supporting
the jury’s verdicts, and the trial judge’s calculation of his sen-
tence under the Sentencing Guidelines. Since the district court
2 No. 22-1417

did not err in any respect and there was suﬃcient evidence to
convict Tinsley, we aﬃrm.
 I. Background
 A. Factual Background
 The Stock Yards Bank & Trust in Carmel, Indiana was
robbed on May 13, 2019. Two men entered the bank, covered
head-to-toe with black clothing and face masks. One, wearing
a black Indiana Pacers hat, walked up to a teller and presented
a demand note. The other robber, carrying a gun, confronted
a bank manager. The robbers used zip ties to bind the two
employees’ hands and stole over $67,000. Surveillance foot-
age shows the robbers exiting the bank and getting into a
Chrysler Aspen SUV, which was parked at an angle next to
the handicap space in the parking lot. Aspens were only man-
ufactured for three years, and only 673 were registered in In-
diana.
 While investigating the robbery, police found a blue dis-
posable glove in the bank parking lot, near the handicap spot.
DNA analysis revealed Tinsley’s DNA on the glove. After a
vehicle records search showed a silver Aspen registered to
Tinsley, police obtained a search warrant for the vehicle and
Tinsley’s home.
 They conducted a traffic stop in September 2019, while
Tinsley was driving his Aspen. Officers found two loaded
guns on him. Searches of his vehicle and home revealed nu-
merous other guns, along with extended magazines; baggies
of marijuana; and various pills and a powder, each containing
No. 22-1417 3

methamphetamine. In addition, officers found blue disposa-
ble gloves, a black Pacers hat, 1 black clothing, and zip ties.
 Officers also searched Tinsley’s phone. Text messages
from around the time of the robbery show individuals asking
to purchase drugs and Tinsley replying that he did not have
any to sell. Then, hours after the robbery, Tinsley contacted a
supplier to purchase drugs. Soon after, he messaged his cus-
tomers that he had restocked.
 B. Procedural Background
 The indictment charged Tinsley with the following crimes:
armed bank robbery (Count One); brandishing a firearm in
furtherance of a crime of violence (Count Two); possession of
marijuana with intent to distribute (Count Three); possession
of methamphetamine with intent to distribute (Count Four);
carrying a firearm during and in relation to a drug trafficking
crime (Count Five); and felon in possession of a firearm
(Counts Six and Seven).
 Before trial, Tinsley moved to sever the bank robbery
counts (Counts One and Two) from the drug counts. He ar-
gued that a joint trial would prejudice his defense for the lat-
ter counts in light of the evidence the government intended to
submit to prove the bank robbery—particularly text messages
concerning drug deals from around the time of the robbery.
The court denied the motion before trial, and Tinsley did not

 1 Tinsley argues that his Pacers hat had a white logo while the one

worn by the robber had a black logo. There was conflicting testimony at
trial concerning the color of the logo on the Pacers hat worn by the robber.
Some witnesses identified it as black while others described it as gray or
off-white. Even accepting Tinsley’s characterization of the evidence, it
does not change the outcome of this case.
4 No. 22-1417

renew it at the close of evidence. During trial, the government
moved to admit the same text messages and Tinsley objected.
The court overruled Tinsley’s objection and ultimately admit-
ted the texts subject to a limiting instruction to the jury to only
consider them for the purpose of determining whether Tins-
ley had the motive, intent, or plan to commit the robbery.
 The government introduced these text messages through
FBI Special Agent Secor. Secor testified in a dual capacity; he
was both an investigating officer and an expert witness with
regard to “narcotics, code language, and distribution activi-
ties.” In that second capacity, Secor interpreted the text mes-
sages Tinsley sent and received around the time of the rob-
bery. When the court designated Secor as an expert witness,
it instructed the jury that it was “up to [them] to determine
how much weight, if any, to give [his] opinions.”
 Ultimately, the jury found Tinsley guilty on all seven
counts. Tinsley did not object to the court’s Sentencing Guide-
lines calculation and was sentenced to twenty-five years in
prison.
 II. Discussion
 A. Motion to Sever
 Federal Rule of Criminal Procedure 14(a) provides that
“[i]f the joinder of offenses … in an indictment … appears to
prejudice [the] defendant or the government, the court may
order separate trials of counts.” Fed. R. Crim. P. 14(a). Before
trial, Tinsley moved to sever the trials for his robbery and
drug offenses, but the court denied his motion.
 Generally, “[f]ailure to renew a motion to sever at the close
of evidence results in waiver.” United States v. Plato, 629 F.3d
646, 650 (7th Cir. 2010). This is so “because the close of
No. 22-1417 5

evidence is the moment when the district court can fully as-
certain whether the joinder of multiple counts was unfairly
prejudicial to the defendant’s right to a fair trial.” United States
v. Cardena, 842 F.3d 959, 980 (7th Cir. 2016) (quoting United
States v. Rollins, 301 F.3d 511, 518 (7th Cir. 2002)).
 Failure to renew the motion at the close of evidence may
be excused where “renewal would have been futile.” United
States v. Maggard, 865 F.3d 960, 970 (7th Cir. 2017). Because
Tinsley did not renew his motion to sever, he invokes that ex-
ception.
 Proving futility is a high bar. It is only found “in rare cases
where the court makes abundantly clear that filing such a mo-
tion would be useless.” Id. at 971 (citation omitted); see also
United States v. Cardena, 842 F.3d 959, 980 (7th Cir. 2016). Here,
the district court never indicated that renewing Tinsley’s mo-
tion would be futile. See Maggard, 865 F.3d at 970−71 (conclud-
ing issue had been waived despite the court repeatedly over-
ruling defendants’ objections at trial because “the court [had
not] explicitly indicate[d] that such a renewed motion
w[ould] not be entertained”). Moreover, at the close of evi-
dence, Tinsley’s attorney made an oral motion for acquittal
but did not renew the motion to sever. See id. (explaining de-
fendants’ presentation of other motions at the close of evi-
dence supported finding waiver where defendants did not re-
new their motion to sever).
 As there is no compelling evidence of futility, Tinsley has
waived his arguments with respect to his motion to sever.
 B. Admission of the Text Messages
 The district court admitted into evidence Tinsley’s text
messages from before and after the robbery. The
6 No. 22-1417

government’s argument in favor of admission was that the
texts show Tinsley’s motive to commit the robbery. Tinsley,
for his part, says the text messages amount to inappropriate
propensity evidence bearing on his drug possession
charges—that is, the jury could treat his drug dealing efforts
from around the time of the robbery as evidence of his drug
possession with intent to distribute in September 2019.
 “Decisions to admit evidence are reviewed for abuse of
discretion,” United States v. Frazier, 213 F.3d 409, 414 (7th Cir.
2000), and will “be overturned only if no reasonable person
would agree with the trial court’s ruling,” Griffin v. Foley, 542
F.3d 209, 218 (7th Cir. 2008).
 “Rule 404(b) excludes relevant evidence of other crimes,
wrongs, or acts if the purpose is to show a person’s propensity
to behave in a certain way ….” United States v. Gomez, 763 F.3d
845, 855 (7th Cir. 2014) (en banc). However, such evidence is
admissible for other purposes, including “proving motive,
opportunity, intent, preparation, plan, knowledge, identity,
absence of mistake, or lack of accident.” Id. (quoting Fed. R.
Evid. 404(b)(2)).
 The court here admitted the text messages, with a limiting
instruction, solely for the permissible purpose of determining
whether Tinsley “had the motive, intent, or plan to commit
armed bank robbery.” The messages were relevant in that
context, particularly because whether Tinsley committed the
robbery was a disputed fact at trial. See id. at 857 (considering
whether “the non-propensity factual proposition is actually
contested in the case”). Indeed, one may infer “motive, intent,
or plan” by comparing Tinsley’s texts before the robbery (in-
dicating he did not have drugs to sell) to his texts afterwards
(seeking to purchase drugs and then attempting to sell them).
No. 22-1417 7

 Tinsley does not dispute that the texts can go to his motive
for the robbery. Instead, he argues that the prejudicial impact
of this evidence as to the drug distribution counts outweighs
its probative value as to the robbery counts. In doing so, he
takes aim at the district court’s Rule 403 analysis.
 Even after finding the evidence relevant for a non-propen-
sity purpose, the court may exclude it under Rule 403 if its
probative value is substantially outweighed by a danger of
unfair prejudice. See Gomez, 763 F.3d at 856–57. While “other-
acts” evidence often “raises special concerns about unfair
prejudice,” id., that alone is not sufficient to prohibit admis-
sion. For example, we have held that it is not an abuse of dis-
cretion to admit evidence of defendants’ drug use to establish
their motive to commit bank robbery, where drug use or pos-
session is uncharged conduct. See, e.g., United States v. Brooks,
125 F.3d 484, 499–500 (7th Cir. 1997) (holding that while it was
“detrimental to the defendants for the jury to view them as
drug addicts,” evidence that they used cocaine and “desire[d]
to obtain more” was admissible on the basis that it “was rele-
vant to [their] motive” to rob a bank).
 Granted, there may be greater potential for prejudice
where the “other-acts” evidence supports a propensity infer-
ence as to other crimes tried in the same proceeding. See, e.g.,
United States v. Coleman, 22 F.3d 126, 134 (7th Cir. 1994) (rec-
ognizing that joinder of offenses elevates “the risk of unnec-
essary unfairness” such that courts “should be especially
watchful for … illegitimate cumulation of evidence”). That
said, there is no categorical bar to admitting such evidence.
Rather, the Rule 403 balancing test invokes the district court’s
considerable discretion. See Gomez, 763 F.3d at 856–57.
8 No. 22-1417

 Here, the district court, exercising its discretion, deter-
mined that the text messages’ relevance was not substantially
outweighed by unfair prejudice. Nevertheless, it issued a lim-
iting instruction that addressed Tinsley’s concern head-on.
See Rollins, 301 F.3d at 520 (“[T]he risk of prejudice was sub-
stantially reduced by limiting instructions given by the dis-
trict court, which directed the jury to limit their consideration
of this evidence to the issue of identity.”); United States v. Mal-
lett, 496 F.3d 798, 802 (7th Cir. 2007) (“Absent any showing
that the jury could not follow the court’s limiting instruction,
we presume that the jury limited its consideration of the tes-
timony in accordance with the court’s instruction.”). The
court’s decision to admit this evidence was far from an abuse
of discretion—all the more so because it is quite possible that
the text messages could have come in as evidence in a separate
trial concerning only the drug charges. Cf. Rollins, 301 F.3d at
519 (affirming admission of prejudicial “other crimes” evi-
dence in trial on joined offenses “[b]ecause evidence of the
[crimes] would have been mutually admissible if the counts
had been tried separately”).
 For all these reasons, we cannot conclude that “no reason-
able person would agree with the trial court’s ruling.” Griffin,
542 F.3d at 218. 2

 2 Tinsley makes another argument based on benign language in the

advisory committee notes to Rule 404(b). Essentially, he takes the position
that Rule 404(b) does not apply at all when the at-issue evidence concerns
a different crime in the same case. We do not read the notes as announcing
such a broad rule.
No. 22-1417 9

 C. Secor’s Testimony
 Tinsley argues that the district court erred in permitting
an expert witness to opine on his intent. During trial, Special
Agent Secor testified in a dual capacity, both about facts
learned through his investigation of the robbery, as well as in
an expert capacity concerning narcotics, code language, and
distribution activities. Tinsley contends that Secor improperly
testified about Tinsley’s intent when he interpreted text mes-
sages Tinsley sent and received around the time of the rob-
bery—the same text messages previously discussed.
 Tinsley did not object to Secor’s testimony on that basis
during trial, so our review is for plain error. United States v.
Winbush, 580 F.3d 503, 510 (7th Cir. 2009). “We will reverse
only if the error compromised the defendant’s substantial
rights and seriously affected the fairness, integrity, or public
reputation of judicial proceedings.” Id.
 Rule 704(b) prohibits experts from testifying to “an opin-
ion or inference as to whether the defendant did or did not
have the mental state or condition constituting an element of
the crime charged.” Id. at 512 (quoting Fed. R. Evid. 704(b)).
Even still, an expert can “testify in general terms about facts
or circumstances from which a jury might infer that the de-
fendant intended to distribute drugs … as long as it is clear
that the opinion is based on the expert’s knowledge of com-
mon criminal practices.” Id. (citations and internal quotation
marks omitted). In determining on which side of the line the
expert testimony falls, “a relevant factor is the degree to
which the expert witness states, and/or specifically refers to,
the intent of the defendant.” United States v. Mancillas, 183
F.3d 682, 706 (7th Cir. 1999).
10 No. 22-1417

 During Secor’s testimony, and after he was designated as
an expert witness, the government questioned him about the
meaning of texts Tinsley exchanged with various individuals.
The government cabined much of its questioning with
phrases like: “[B]ased on your training and experience,
what … was your opinion …?” Secor did not testify directly
to Tinsley’s intent. Rather, the questioning focused on the
meaning of drug dealing terminology used in the text mes-
sages. Secor testified that Tinsley arranged to purchase and
sell drugs, skirting the issue of whether Tinsley intended to
deal drugs.
 We have held that the prohibition against expert testi-
mony about a defendant’s intent is “implicate[d]” by the ex-
pert’s use of the word “intended.” United States v. Brown, 7
F.3d 648, 653 & n.2 (7th Cir. 1993) (finding no error even
where agent testified that the drugs were “intended for distri-
bution” because it was clear in context that the testimony was
based on the agent’s experience); see also United States v.
Blount, 502 F.3d 674, 679 (7th Cir. 2007) (admitting an officer’s
testimony as to the defendant’s motive where it was clear that
it was based on his experience as a police officer, not “special
personal knowledge” of the defendant). Tinsley does not
point us to Secor’s use of the word “intended.” Even if he had,
the nature of the government’s questioning clarified that Se-
cor based his testimony on his expertise.
 Furthermore, Rule 704(b) prohibits an expert from “tes-
tify[ing] to ‘an opinion or inference as to whether the defend-
ant … ha[d] the mental state or condition constituting an ele-
ment of the crime charged.’” Winbush, 580 F.3d at 512 (emphasis
added) (quoting Fed. R. Evid. 704(b)). Even if we accept Tins-
ley’s proposition that Secor testified about his intent, Secor’s
No. 22-1417 11

testimony about texts from around the time of the robbery
was not admitted to prove an element of any crime charged.
Instead, Secor’s testimony explained Tinsley’s drug dealing
activities to establish his motive to rob the bank.
 While there is an increased risk of prejudice where a wit-
ness has a dual role, a cautionary instruction is sufficient to
dissipate the risk. For example, in United States v. Glover, we
found no error in admitting testimony from a witness who
was both an evidence technician working on the case and a
fingerprint expert, in part because the district court gave
“cautionary instructions” that diminished any prejudice. 479
F.3d 511, 519 (7th Cir. 2007); see also Blount, 502 F.3d at 679–80
(“[T]he district court cautioned the jury that it could take [the
expert’s] opinion or leave it, further reducing any fear of in-
appropriate influence.”).
 In this case, the court’s instruction achieved the same ef-
fect. Most notably, it told the jury that “some of [Secor’s] tes-
timony is opinion based on his training and experience, rather
than first-hand knowledge, and it will be up to you to deter-
mine how much weight, if any, to give those opinions.” That
sufficed to undercut any danger of the jury misconstruing Se-
cor’s testimony. Tinsley’s opportunity to cross-examine Secor
provided yet another safeguard. See United States v. Doe, 149
F.3d 634, 637 (7th Cir. 1998) (noting a “greater danger of un-
fair prejudice” where an expert is “involved in the defend-
ant’s arrest” but that “[s]pecial cautionary instructions” and
the “full opportunity for cross-examination” offset the preju-
dice). Any error was harmless in light of these protections. See
Winbush, 580 F.3d at 510.
12 No. 22-1417

 D. Theis’s Testimony
 Tinsley takes issue with the district court’s decision to per-
mit identification testimony from Officer Adam Theis. 3 He ar-
gues it was improper for the court to permit Theis, who was
not an eyewitness to the robbery, to identify Tinsley through
the bank’s surveillance footage. Tinsley contends that admit-
ting this evidence was an error because it was “unfounded
opinion testimony on the ultimate issue before the jury.” As
Tinsley failed to object, our review is for plain error. See, e.g.,
United States v. Malagon, 964 F.3d 657, 660 (7th Cir. 2020).
 In United States v. Jett, we explained that to admit identifi-
cation testimony based on surveillance footage, there must be
a “basis for concluding that the witness ‘is more likely to cor-
rectly identify the defendant from the photograph than is the
jury.’” 908 F.3d 252, 271 (7th Cir. 2018) (quoting United States
v. White, 639 F.3d 331, 336 (7th Cir. 2011)). But “[w]hen the
same match can be made by the jury, ‘the witness is superflu-
ous’ and the testimony should not be admitted.” Id. (quoting
United States v. Earls, 704 F.3d 466, 472 (7th Cir. 2012)). We de-
termined that, in Jett, the agent’s identification testimony was
inappropriate because his “fleeting interaction with [the de-
fendant]” was “not the sort of familiarity … that we have gen-
erally thought helpful to a jury under [Federal] Rule [of Evi-
dence] 701.” Id. at 272. Regardless, we held that admission of
the agent’s testimony was harmless error in large part because
“[t]he jurors observed the surveillance footage on their own.”

 3 Tinsley conceives of this argument as a challenge to the sufficiency

of the evidence to convict him of robbery; however, it is better understood
as another challenge to the district court’s evidentiary rulings.
No. 22-1417 13

Id.; see also White, 639 F.3d at 336 (noting that “the jury was
free to disregard” the identification testimony).
 Theis’s identification of Tinsley was based on his investi-
gation of the robbery as lead detective. This involved exami-
nation of evidence and speaking with eyewitnesses. To make
the identification, Theis matched clothes and other evidence
to the grainy surveillance footage. This fact pattern differs
from Jett, where the only basis for the agent’s identification of
the defendant was a short, in-person interaction while execut-
ing a search warrant. Jett, 908 F.3d at 271–72. Still though, Jett
collected cases suggesting that while “a witness’s experience
with the defendant need not be lengthy,” identification testi-
mony is “helpful to a jury” when the witness’s familiarity is
based on longer periods of “close association.” Id. at 272.
 Even if Theis lacked the background to substantiate his
eyewitness identification testimony, also like Jett, the jury re-
viewed the surveillance footage and other evidence during
the trial. As a result, any error was harmless.
 E. Suﬃciency of the Evidence
 “[W]e review a challenge to the sufficiency of the evi-
dence … to determine whether any rational trier of fact could
have found the essential elements of the crime beyond a rea-
sonable doubt, viewing the evidence in the light most favora-
ble to the government.” United States v. Faulkner, 885 F.3d 488,
492 (7th Cir. 2018) (quoting United States v. Webster, 775 F.3d
897, 904–05 (7th Cir. 2015)). Reversal is warranted “only if ‘the
fact finder’s take on the evidence was wholly irrational.’” Id.
(quoting United States v. Hoogenboom, 209 F.3d 665, 669 (7th
Cir. 2000)). As a result, “[a] defendant posing this challenge
‘faces a nearly insurmountable hurdle.’” United States v.
14 No. 22-1417

Dinga, 609 F.3d 904, 907 (7th Cir. 2010) (quoting United States
v. Morris, 576 F.3d 661, 665–66 (7th Cir. 2009)). 4
 1. Methamphetamine Conviction
 Tinsley takes aim at the sufficiency of the evidence to con-
vict him for possession with intent to distribute methamphet-
amine.
 “To sustain a conviction for possession of methampheta-
mine with intent to distribute, the government has to prove
the following elements beyond a reasonable doubt: the de-
fendant knowingly and intentionally possessed methamphet-
amine, he possessed methamphetamine with the intent to dis-
tribute it, and he knew the material was a controlled sub-
stance.” United States v. Lopez, 907 F.3d 537, 543 (7th Cir. 2018).
Tinsley’s only arguments on appeal are that he did not have
a large quantity of meth (a bit more than ten grams) and there
was no evidence he actually sold the meth.
 At trial, a government witness testified that Tinsley pos-
sessed a quantity of meth consistent with distribution as op-
posed to personal use. Evidence of Tinsley’s intent to distrib-
ute was bolstered by the presence of baggies, a scale, and fire-
arms, which were found alongside the drugs. Tinsley’s text
messages from the days prior to his arrest in September were
also introduced. They show individuals contacting Tinsley to

 4 Tinsley first argues there was insufficient evidence to convict him for

possession with the intent to distribute marijuana. However, he does not
identify any evidence lacking for his conviction. Instead, he restates his
prior arguments concerning the denial of his motion to sever, the admis-
sion of Rule 404(b) evidence, and Secor’s testimony. We have already af-
firmed those rulings, so for the reasons previously stated, Tinsley’s mari-
juana conviction stands.
No. 22-1417 15

purchase pills, discussion about the quantity needed, and
Tinsley arranging the sale.
 We have regularly found evidence of this sort sufficient to
support an inference of intent to distribute. See, e.g., United
States v. Irby, 558 F.3d 651, 654 (7th Cir. 2009) (holding that
possession of a distribution quantity of crack cocaine pack-
aged in fifty-nine baggies along with a scale was sufficient to
infer intent); United States v. Morris, 576 F.3d 661, 671 (7th Cir.
2009) (holding that 0.09 grams constituted a distributable
amount of drugs where there was other evidence of intent in-
cluding evidence of prior “probable drug transactions” and
other drugs “packaged for resale”); United States v. Huddle-
ston, 593 F.3d 596, 601 (7th Cir. 2010) (holding that possession
of 5.6 grams of cocaine was sufficient to support an inference
of intent to distribute where “the jury heard other evidence
from which to infer that intent”). It is beyond debate that “cir-
cumstantial evidence is no less probative of guilt than direct
evidence,” United States v. Starks, 309 F.3d 1017, 1021 (7th Cir.
2002), and a conviction for possession with intent to distribute
does not require an actual sale. We have no doubt this evi-
dence is sufficient to convict Tinsley. 5
 2. Robbery Conviction
 Tinsley’s last argument regarding the sufficiency of the ev-
idence concerns his bank robbery conviction.
 Conviction for bank robbery requires the jury to find that
(1) Tinsley took “from the person or presence of another”

 5 Tinsley also challenges the sufficiency of the evidence for his convic-

tion of carrying a firearm during and in relation to a drug trafficking crime
(Count Five). His only argument, though, is that if his meth charge is re-
versed, this charge must be too. In light of the above, Count Five stands.
16 No. 22-1417

money belonging to Stock Yards Bank & Trust; (2) “by force
or violence, or by intimidation;” and (3) that Stock Yards Bank
& Trust was federally insured. See United States v. Carter, 410
F.3d 942, 952 (7th Cir. 2005) (referencing 18 U.S.C. § 2113(a)).
Tinsley argues the evidence was insufficient to find beyond a
reasonable doubt that he was the person who committed the
robbery, so, in essence, he disputes the first two elements of
the crime.
 In support of Tinsley’s conviction, the government intro-
duced, in part, the following evidence: (1) text messages from
around the time of the robbery, previously discussed; (2) the
blue, disposable glove found in the parking lot of the bank
that contained Tinsley’s DNA, as well as similar blue gloves
found at Tinsley’s home; (3) evidence that Tinsley owned a
silver Aspen and that it was a rare car; (4) Tinsley’s clothing
matching or resembling clothing worn by the bank robbers;
and (5) the zip ties found at Tinsley’s home matching or re-
sembling those used to zip tie the bank employees.
 Tinsley tries to explain away a few of these pieces of evi-
dence. The main event is the blue glove. He emphasizes that
the glove returned positive for three people’s DNA—not just
his—and claims it was found a distance from where the get-
away vehicle was parked.
 The fact that Tinsley’s DNA was on a glove found outside
the bank is significant, particularly given his initial represen-
tation during his custodial interview that he never goes to
Carmel. (The closest place he identified going was five to ten
miles from the bank.) The jury heard extensive testimony
from a DNA expert, who explained that the glove contained
DNA from two other individuals whose DNA did not match
No. 22-1417 17

an existing profile. Even so, the jury found Tinsley guilty of
bank robbery.
 That a trier of fact could conceive of a theory of innocence
based off the evidence does not mean the evidence was insuf-
ficient to support a conviction. “[T]he government’s proof
need not exclude every reasonable hypothesis of innocence so
long as the total evidence permits a conclusion of guilt be-
yond a reasonable doubt; the trier of fact is free to choose
among various reasonable constructions of the evidence.”
Starks, 309 F.3d at 1022 (quoting United States v. Harris, 271
F.3d 690, 703–04 (7th Cir. 2001)).
 Tinsley makes much out of precisely where police found
the glove—next to the curb in the accessible aisle for the hand-
icap parking space. Trial testimony established that the Aspen
was parked at an angle “right next to the handicap space.” It
is eminently clear that these locations were close to each other.
The fact that the glove was not found in the precise location
of Tinsley’s Aspen does not ruin the government’s case or ren-
der the jury’s guilty verdict “wholly irrational.” United States
v. Kapp, 419 F.3d 666, 672 (7th Cir. 2005) (explaining that a ver-
dict may be overturned “only when the record contains no
evidence, regardless of how it is weighed, upon which a ra-
tional trier of fact could find guilt beyond a reasonable doubt”
(citation and internal quotation marks omitted)).
 Tinsley claims there are a host of other material discrep-
ancies too. For instance, he argues that his Aspen is silver, and
the one at the crime scene was originally identified as white.
Still, the volume of evidence in support of his conviction is
significant. See United States v. Edwards, 869 F.3d 490, 503 (7th
Cir. 2017) (explaining that we will not “reweigh evidence”
when examining a jury’s verdict). Where, as here, “there is a
18 No. 22-1417

reasonable basis in the record supporting the verdict,
then … the verdict must stand.” Id.
 Looking at the totality of the evidence that the government
presented in this case, it is sufficient to “provide[] a rational
basis upon which a jury could find guilt beyond a reasonable
doubt.” Starks, 309 F.3d at 1025. Consequently, we affirm
Tinsley’s convictions.
 F. Guidelines Calculation
 We review a district court’s application of the Sentencing
Guidelines for plain error in cases like this when a defendant
inadvertently fails to preserve his objection. United States v.
Boyle, 28 F.4th 798, 801 (7th Cir. 2022), cert. denied, 143 S. Ct.
173 (2022) (mem.). To be plain, the error must be “clear or ob-
vious,” “affect[] the defendant’s substantial rights,” and “se-
riously impugn[] the fairness, integrity, or public reputation
of judicial proceedings.” United States v. Hammond, 996 F.3d
374, 400 (7th Cir. 2021) (quoting United States v. Goodwin, 717
F.3d 511, 518 (7th Cir. 2013)).
 Tinsley contends that the district court’s Guidelines calcu-
lation was incorrect because the court double counted the
guns that formed the basis for his 18 U.S.C. § 924(c) convic-
tions (brandishing a firearm in furtherance of the bank rob-
bery and carrying a firearm during a drug trafficking crime).
The base offense levels for Tinsley’s 18 U.S.C. § 922(g) convic-
tions (felon in possession) were increased because he, a felon,
possessed eight guns. Two of those guns also formed the basis
for his § 924(c) convictions (i.e., the guns used during the bank
robbery and in relation to his drug offenses). Tinsley contends
this was error—that the district court should have considered
No. 22-1417 19

only six guns when calculating the base offense level for his
§ 922(g) convictions.
 Tinsley’s primary support for this argument is Applica-
tion Note 4 to Guideline § 2K2.4, the Guideline applicable to
his § 924(c) convictions. It provides: “If a sentence under this
guideline is imposed in conjunction with a sentence for an un-
derlying offense, do not apply any specific offense character-
istic for possession, brandishing, use, or discharge of an ex-
plosive or firearm when determining the sentence for the un-
derlying offense.” U.S.S.G. § 2K2.4, cmt. n.4. Tinsley’s briefing
leaves his argument obscure, but the gist seems to be that his
§ 922(g) convictions constitute an “underlying offense” for
which Application Note 4 prohibits application of “specific
offense characteristics” for the use of a gun.
 Tinsley fundamentally misunderstands § 924(c) and its
applicable Guideline. Section 924(c) is “one of several
measures [used] to punish gun possession by persons en-
gaged in crime,” specifically crimes of violence and drug
crimes. Abbott v. United States, 562 U.S. 8, 12 (2010). Guideline
§ 2K2.4, titled “Use of a Firearm … During or in Relation to
Certain Crimes,” applies to § 924(c) convictions. Logically
then, Application Note 4’s use of the phrase “underlying of-
fense” refers to the crime of violence or drug crime the de-
fendant was engaged in while possessing a gun—not to any
additional charges resulting from the defendant’s possession
of that gun, such as being a felon in possession. See United
States v. Foster, 902 F.3d 654, 657 (7th Cir. 2018) (interpreting
“underlying offense” in Application Note 4 to refer to the
armed robbery underlying the defendant’s § 924(c) convic-
tion, not his additional § 922(g) conviction).
20 No. 22-1417

 Undeterred, Tinsley argues, and emphasized during oral
argument, that the Guideline for § 924(c) convictions—
§ 2K2.4—should be read in conjunction with the Guideline for
§ 922(g) convictions—§ 2K2.1. However, “[w]hen interpret-
ing a specific provision of the sentencing guidelines, we begin
with the text of the provision” and consider “th[at] guide-
line’s application notes;” we do not look to “application notes
[that] pertain to a different guideline.” United States v. Cook,
850 F.3d 328, 332 (7th Cir. 2017) (citations and internal quota-
tion marks omitted); see also, e.g., United States v. Slone, 990
F.3d 568, 572 (7th Cir. 2021) (applying an application note to
§ 2K2.1 to evaluate the Guideline sentence for a § 922(g) con-
viction), cert. denied, 211 L. Ed. 2d 70 (Oct. 4, 2021). The only
portion of § 2K2.4 that refers to § 2K2.1 is not applicable to
Tinsley’s case. See U.S.S.G. § 2K2.4, cmt. n.4 (“If
the … weapon that was … brandished[] [or] used[] … in the
course of the underlying offense also results in a conviction
that would subject the defendant to an enhancement un-
der … § 2K2.1(b)(6)(B) … do not apply that enhancement.”).
 Tinsley points to our decision in United States v. Busta-
mante for support. 493 F.3d 879, 889–90 (7th Cir. 2007) (apply-
ing Application Note 4 to § 2K2.4 as support to prohibit dou-
ble counting the conduct underlying a § 922(g) conviction).
However, since Bustamante, this Court has “reversed course”
on its prohibition against double counting. Cook, 850 F.3d at
334 (explaining that in 2012, this Circuit stopped applying the
rule that double counting is generally impermissible). Now,
“double counting is generally permissible unless the text of
the guidelines expressly prohibits it.” United States v. Vizcarra,
668 F.3d 516, 519 (7th Cir. 2012); Cook, 850 F.3d at 334 (“Any
language in our earlier cases contradicting our holding in Viz-
carra is no longer good law.”). The state of the law in 2007
No. 22-1417 21

motivated our effort to avoid double counting and led us to a
misinterpretation of the Guidelines in Bustamante, reading
Application Note 4 to § 2K2.4 as applying to sentences under
§ 2K2.1. With the landscape changed, it is evident that the
Guidelines do not support such a reading. Consequently, that
portion of Bustamante must now be considered overruled. 6
 Nothing in § 2K2.1 (the Guideline applicable to Tinsley’s
§ 922(g) convictions), or its application notes, prohibits dou-
ble counting and neither § 2K2.1 nor § 2K2.4 expressly pro-
hibit using the guns that form the basis for a § 924(c) convic-
tion to increase the defendant’s sentence for a § 922(g) convic-
tion. Instead, § 2K2.4 “specifically directs the court not to ap-
ply any offense-characteristic enhancement for firearm pos-
session to the underlying count”—which, as explained above,
is the underlying crime of violence or drug crime. United
States v. Sinclair, 770 F.3d 1148, 1158 (7th Cir. 2012). As such,
the district court’s Guidelines calculation did not amount to
inappropriate double counting. 7 If the district court made any
error in calculating Tinsley’s sentence, it is far from plain. 8

 6 Because this opinion overrules a portion of Bustamante, 493 F.3d at

889–90, we circulated this opinion among all active circuit judges pursuant
to Circuit Rule 40(e). No judge voted to rehear this case en banc. Judge
Pryor did not participate in the Rule 40(e) consideration.
 7 Tinsley’s double-counting argument concerning his guns with large-

capacity magazines fails for similar reasons.
 8 As a final note, Tinsley contends the Guidelines are ambiguous and

therefore, application of the rule of lenity requires us to remand his case
for resentencing. As our analysis suggests, we do not find the Guidelines
ambiguous. Thus, the rule of lenity does not apply. See United States v. An-
derson, 517 F.3d 953, 962 (7th Cir. 2008) (applying the rule of lenity only
“when there are serious ambiguities in the text of a criminal statute”).
22 No. 22-1417

 III. Conclusion

 For the reasons explained, the judgment of the district
court is AFFIRMED.